**08 C 745**

**JUDGE NORGLE**
**MAGISTRATE JUDGE NOLAN**

# EXHIBIT A

RECEIVED BY
LEGAL DEPARTMENT
Personal /'25
JAN 11 2008

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 ( ) |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, Chancery_____ DIVISION

(Name all parties)

Jose M. Garcia and Irma Garcia
_____

v.

Midwest Mutual Mortgate Inc., Maria Elrod, Indy Mac Bank

}

08CH00568

No. _____

Serve: See attached

## SUMMONS

**To each Defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ **Richard J. Daley Center, 50 W. Washington, Room** 802_____, **Chicago, Illinois 60602**

☐ **District 2 - Skokie**
**5600 Old Orchard Rd.**
**Skokie, IL 60077**

☐ **District 3 - Rolling Meadows**
**2121 Euclid**
**Rolling Meadows, IL 60008**

☐ **District 4 - Maywood**
**1500 Maybrook Ave.**
**Maywood, IL 60153**

☐ **District 5 - Bridgeview**
**10220 S. 76th Ave.**
**Bridgeview, IL 60455**

☐ **District 6 - Markham**
**16501 S. Kedzie Pkwy.**
**Markham, IL 60426**

☐ **Child Support**
**28 North Clark St., Room 200**
**Chicago, Illinois 60602**

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF
REQUESTED IN THE COMPLAINT.

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 17389
Name: Keil M. Larson
Atty. for: Plaintiffs
Address: 800 North Clark Street Suite 222
City/State/Zip: Chicago, Illinois 60610
Telephone: 312-664-9300

Service by Facsimile Transmission will be accepted at:

WITNESS, JAN 7 2008

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY

Clerk of Court

Date of service: _____,_____
(To be inserted by officer on copy left with defendant
or other person)

312          664-9300
(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Serve:**

Midwest Mutual Mortgage Inc.,
c/o Michael F. Leiva
2554 West Fullerton Avenue
Chicago, Illinois  60647

IndyMac Bank F.S. B.
888 E. Walnut Street
Pasadena  CA  91101

Maria Elrod
5425 West Carmen Avenue
Chicago, Illinois  60630

**In the Circuit Court of Cook County Illinois**
**County Department, Chancery Division**

| | |
|---|---|
| Jose M. Garcia, Irma Garcia, | ) |
| | ) |
| Vs. | ) |
| Plaintiffs, | ) |
| | ) |
| Midwest Mutual Mortgage Inc., Maria Elrod, | ) |
| IndyMac Bank, | ) |
| | ) |
| Defendants. | ) |

**08CH00538**

## COMPLAINT IN EQUITY

Now come the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., Maria Elrod, and the Indy Mac Bank as follows:

1.     The Plaintiffs Jose M. Garcia and Irma Garcia are husband and wife and residents of the County of Cook at all relevant times.

2.     The Defendant Midwest Mutual Mortgage Inc., is an Illinois Corporation allowed to do business in the State of Illinois at all relevant times and does business as a mortgage broker.

3.     The Defendant Maria Elrod is the sister of the Plaintiff Irma Garcia and at all relevant times a resident of Cook County Illinois.

4.     The Defendant IndyMac Bank is a foreign corporation allowed to do business in the State of Illinois and does business as loaning money to homeowners.

5.     The Defendant Unknown Appraiser is an Illinois Appraiser who is in the business of appraising property.

6.     On or before February 1, 2007 the Defendant Maria Elrod owned real property, hereafter referred to as the Property, at 5425 West Carmen Avenue, Chicago, Illinois 60630 with the following legal description:

The east 25 feet of Lot 24 Block 16 in the Village of Jefferson, in the west of the southwest of Section 9, Township 40 North, Range 13 East of the Third Principal Meridian in Cook County Illinois

Having permanent index number of: 13-09-311-049-0000

Commonly known as 5425 West Carmen Avenue, Chicago, Illinois 60630.

1

7.     The Defendant Maria Elrod was behind in her mortgage payments and wanted to refinance this mortgage.  Defendant Maria Elrod discussed this with Defendant Midwest Mutual Mortgage Inc.

8.     The Defendant Midwest Mutual Mortgage Inc., told her to recruit a family member with good credit to buy the property.

9.     Once this family member was recruited, then Midwest Mutual Mortgage Inc., stated it would refinance Defendant Elrod's home and that Defendant Maria Elrod would stay there and make the new mortgage payments and then a year later buy the property back from the family member.

10.     Defendant Maria Elrod recruited her sister and her husband, the Plaintiffs to purchase the property and then sign the new mortgages.

11.     The Plaintiffs met with Defendant Midwest Mutual Mortgage and engaged them as their mortgage broker.

12.     Defendant Midwest Mutual informed the Plaintiffs that they would make the loans substantially higher than the current payoff figure for Defendant Maria Elrod's outstanding loans and give that money to Defendant Maria Elrod who in turn would use that money for one year to pay the mortgage payments and reestablish her credit and then repurchase the home back from the Plaintiffs.

13.     Defendant Midwest Mutual Mortgage informed the Plaintiffs that they did not need a lawyer and that they had nothing to worry about and that Midwest Mutual would take care of them.

14.     Prior to the closing, the Defendant Midwest Mutual Mortgage told the Plaintiffs just to sign all the mortgage documents and that the Defendant would secure the mortgages and everything would be fine.

15.     On or about February 2, 2007, the Plaintiffs signed two Defendant IndyMac Bank's mortgages documents: a first for $360,000.00;  and a second mortgage for $90,000.00.  A copy of both Notes and Mortgages are attached as Exhibits A and B respectively.

16.     In receipt of this $450,000.00 the Defendant Maria Elrod conveyed the Property to the Plaintiffs subject to these two liens.  Plaintiffs do not have a copy of the Deed as Defendant Midwest Mutual Mortgage company did not give them a copy of the same.

17.     The Plaintiffs did not attend the closing but presigned these documents with Defendant Midwest Mutual Mortgage Inc.

18.     Midwest Mutual Mortgage Inc. did not give the Plaintiffs a copy of the RESPA or the closing statement from the closing nor did Midwest Mutual Mortgage provide them any copies of any of the loan applications and other documents.

2

19.     Plaintiff's believe that Midwest Mutual Mortgage Inc., put false statements regarding their income and other false information on the loan applications.

20.     Plaintiffs have made demand upon the Defendants for a copy of the appraisal for the property, the RESPA and other closing documents pertaining to this closing and those demands have been ignored.

21.     Midwest Mutual Mortgage engaged an Unknown Appraiser who appraised the property at a value in excess of $100,000.00 of its fair market value in order to make these above loans.

22.     The Defendant Midwest Mutual Mortgage and Defendant IndyMac Bank did not provide to the Plaintiffs a Truth in Lending Disclosure Statement prior to signing either loan.

23.     The Defendant Maria Elrod has failed to make the required payments on the two outstanding mortgages and has informed the Plaintiffs that the Defendant Midwest Mutual Mortgage took substantially more money from the closing than reported on the Truth in Lending statements.

### Count I Rescission

Now come the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., Maria Elrod, and the Indy Mac Bank as follows:

1-23.   Plaintiffs reassert paragraphs 1 through 23 of the Common Facts as asserted here.

24.     Illinois Courts allow contracts to be rescinded where there is fraud or material non-performance by one of the parties.

25.     Here the purchase price paid by the Plaintiffs was more than $100,000.00 greater than the fair market value of the property.

26.     The Defendant Midwest Mutual Mortgage knew that the purchase price was $100,000.00 greater than actual market value and utilized this fraudulent appraisal to induce this transaction.

27.     Because the Defendant IndyMac Bank did not disclose the Truth in Lending Disclosures timely, the Plaintiffs did not realize this difference before signing the documents.

28.     The Defendant Midwest Mutual Mortgage Company was the agent for Defendant IndyMac Bank and was compensated by IndyMac Bank for its services.

29.     The Plaintiffs believed these above statements and justifiable relied upon these false representations and entered into these mortgages.

30.     The Defendant Maria Elrod has ceased making mortgage payments on the Property but she continues to reside there.

3

31.    The Plaintiffs are offering to execute a deed conveying this Property back to the Defendant Maria Elrod.

Wherefore the Plaintiffs move this Court to do one or more of the following:

A. Rescind and hold for naught the deed between the parties;

B. Rescind and declare the above two mortgages null and void;

C. Any other relief this Court deems fair and just.

### Count II  Consumer Fraud

Now comes the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., and unknown Appraiser as follows:

1-23.   Plaintiffs reassert paragraphs 1 through 23 of the Common Facts as asserted here.

32.    There exists in the State of Illinois a statute titled the Illinois Consumer Fraud and Deceptive Business Act located at 815 ILCS 505/1 et al.

33.    This Statute defines unfair deceptive acts or practices the use of deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact with intent that others rely on the information in the conduct of any trade or commerce, whether that person was in fact misled, deceived or damaged thereby.

34.    The events leading to the signing of the mortgage are covered by this Statute.

35.    The Plaintiffs are defined as consumers under this Statute and are afford protection under this Act.

36.    The Defendants deceived the Plaintiffs in order to secure substantial fees on these loans by securing appraisals in excessive of the fair market value and by fraud.

37.    The Defendants' actions violated this Act.

38.    As a direct result of relying on these false statements by the Defendants, sustained damages they sustained damage to their credit ratings by the failure of timely mortgage payments and over paid for this property.

Wherefore the Plaintiffs request this Court to enter a judgment against the Defendants in the amount to exceed $30,000.00, award them attorney fees and costs and whatever other relief this Court deems fair and just.

### Count III  Fraud

4

Now comes the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., and states as follows:

1-23.   Plaintiffs reassert paragraphs 1 through 23 of the Common Facts as asserted here.

39.   As a direct result of the Defendants fraudulent conduct, the Plaintiffs lost their credit and overpaid for a house by $100,000.00

40.   The conduct of the Defendants was performed with malice and willfulness to harm the Plaintiffs in order to deceive them, which deception was required for the sale of the Properties and is of an egregious nature which must be penalized by the imposition of punitive damages to defer the Defendants and others for likewise doing these activities.

Wherefore the Plaintiffs Arvell and Gloria Irish pray this Court to enter the following Order:

A.   Enter Judgment against the Defendants, jointly and severally, in a sum exceeding $160,000.00;

B.   Award the Plaintiffs their attorneys fees in bringing this Action;

C.   Award the Plaintiffs punitive damages in the amount exceeding $1,000,000.00

D.   Award the Plaintiffs whatever other relief this Court deems fair and just.

## Count IV:  Statutory Violation of Mortgage Broker Act

Now comes the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., and states as follows:

1-23.   Plaintiffs reassert paragraphs 1 through 23 of the Common Facts as asserted here.

41.   The Defendant Midwest Mutual Mortgage held itself out to the general public as professional resident mortgage brokers who could obtain loans for consumers such as the Plaintiffs.

42.   The Defendant Midwest Mutual Mortgage is an entity required to be licensed to do business in the State of Illinois under the Illinois Residential Mortgage License Act of 1987. See generally 205 ILCS 635/1-1, *et seq.*

43.   The Defendant Midwest Mutual Mortgage is an Residential Mortgage Broker, as defined by the above act,  that is regulated by the Illinois Office of Banks and Real Estate, a regulatory board of the State of Illinois.

44.    The Defendant Midwest Mutual Mortgage is required to comply with the Illinois Office of Banks and Real Estate regulations as found in the Illinois Administrative Code Title 38 Part 1050 *et seq.*

45.    At all relevant times, the Defendant Midwest Mutual Mortgage does not provide the funding for the residential loans it secures for Illinois consumers.

46.    The business of Defendant Midwest Mutual Mortgage is to supply information to consumers and residential mortgage lenders with the ultimate purpose is to secure mortgage commitments from these lenders for the consumers.

47.    Defendant Midwest Mutual Mortgage supplies information pertaining regarding whether a consumer is qualified for a mortgage.

48.    The Defendant Midwest Mutual Mortgage acts on behalf of Illinois Consumers in soliciting, processing, placing and negotiating of residential mortgage loans at all relevant times.

49.    The Defendant Midwest Mutual Mortgage enters into wholesale agreements with various financial institutions throughout the world to place the residential mortgages it secures from Illinois consumers.

50.    The Defendant Midwest Mutual Mortgage takes information from Illinois Consumers and submits the information obtained to Loan Prospector automated underwriting system operated and controlled by Freddie Mac, an quasi-governmental Federal agency that facilitates the residential mortgage secondary market.

51.    The Defendant Midwest Mutual Mortgage owed a duty to the Plaintiff to exercise the skill and care of the professional residential mortgage broker to use the standard of care of a reasonable member of the profession of residential mortgage brokers.

52.    The Defendant Midwest Mutual Mortgage, by and through its agents, servants, or employees breached this standard of care by one or more of the following:

(a)    Provided false appraisals on the value of the property in order to generate greater commissions for itself;

(b)    Improperly advised the Plaintiffs about the loan products they secured by placing them in loan products that only paid interest for the first five years;

(c)    Failed to provide them with copies of the RESPA closing statement itemizing the expenses;

(d)    Violated Title 38 Section 1050.1010 by: (1) failing to provide a brokerage agreement; (2) failing to include in conspicuous type a statement stating that the Plaintiff had a right to have the brokerage agreement reviewed by his attorney before signing, (3) failing to include in the brokerage agreement that if the licensee makes false or misleading statements that the Plaintiff can recover actual costs and attorney fees from the Defendant; otherwise violated Section 1050.1010 and 1050.1020 by failing to disclose in clear and conspicuous statement that the Defendant does not make loans.

6

(e)  Prepared false documents and lied to the lender

(f)  Failed to warn them about the consequences of signing false documents;

(g)  Placed them into a mortgage that they could not afford to make payments based upon the prevailing guidelines of the industry.

(h)  Was otherwise negligent;

53.  The Plaintiffs reasonably relied upon the advice given by the Defendant and entered into this transaction.

54.  As a direct and proximate cause of the above negligent acts or omissions by the Defendant, the Plaintiffs were damaged as they agreed to a mortgage that they could not afford

Wherefore the Plaintiffs pray that this Court enters Judgment against the Defendant Midwest Mutual Mortgage in the amount to exceed $50,000.00, plus their reasonable attorney fees and costs and whatever other relief these court deems fair and just.

## Count V:  Civil Conspiracy

Now comes the Plaintiffs, Jose M. Garcia and Irma Garcia, husband and wife, by and through their attorney Keil M. Larson and complains against Midwest Mutual Mortgage Inc., and the Unknown Appraiser and states as follows:

1-20.  Plaintiffs reassert paragraphs 1 through 20 of the Common Facts as asserted here.

55.  Each of the Defendants knowingly participated in this scheme to defraud the Plaintiffs of their hard earned credit and possible loss of their assets and income

56.  Each of the Defendants understood their assigned roles in hoodwinking the Plaintiffs and then proceeding with this false loan.

57.  As a direct result of the Defendants' tortuous conduct, the Plaintiffs lost their credit and stand to lose their assets as a result of these fraudulent loans.

58.  The conduct of the Defendants was performed with malice and willfulness to harm the Plaintiffs in order to deceive them, which deception was required for the mortgage of the Properties and is of an egregious nature which must be penalized by the imposition of punitive damages to defer the Defendants and others for likewise doing these activities.

7

Wherefore the Plaintiffs pray this Court to enter the following Order:

A.    Enter Judgment against the Defendants, jointly and severally, in a sum exceeding $160,000.00;

B.    Award the Plaintiffs their attorneys fees in bringing this Action;

C.    Award the Plaintiffs punitive damages in the amount exceeding $1,000,000.00

D.    Award the Plaintiffs whatever other relief this Court deems fair and just.

Respectfully submitted,

Keil M. Larson

Keil M. Larson
Attorney for Plaintiff
800 North Clark Street Suite 222
Chicago, Illinois 60610
(312) 664-9300 fax: (312) 664-5363
Email: keil@keillarson.com
17389

**Verification**

Under the penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except to matters therein stated to be on information and belief and as to such matters the undersigned certifies that he or she verily believes the same to be true.

Jose M. Garcia                              Irma Garcia

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY PERIOD
### (1-Year LIBOR Index - Rate Caps)
### (Assumable after Initial Period)
### ( 10 Year Interest Only Period)

Loan #    125442122                                      MIN: 100055401254421227

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

February 2, 2007                 Arlington Heights            Illinois
[Date]                              [City]                    [State]

5425 W Carmen Avenue, Chicago, IL 60630

[Property Address]

### 1.   BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $   360,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is      IndyMac Bank, F.S.B., a federally chartered savings bank
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.375    %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.   PAYMENTS
#### (A) Time and Place of Payments
I will make a payment every month on the first day of the month beginning on          March 1, 2007           .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on     February 1, 2037     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at      IndyMac Bank, F.S.B., P.O. Box 78826, Phoenix, AZ 85062-8826
or at a different place if required by the Note Holder.

#### (B) Amount of My Initial Monthly Payments
Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $      1,912.50      . This amount may change in accordance with subsection (C) below.



**IndyMac Bank**
**Fixed/Adjustable Rate Note - 1 Yr. Libor Index - Interest Only Period - Multistate**

Page 1 of 5

8480830 (0506)                    VMP Mortgage Solutions, Inc. (800)521-7291

Initials

**Form 5600**
**6/05**

**(C) Monthly Payment Changes**

The First P&I Payment Due Date is   March 1, 2017   .

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Notwithstanding the provisions of Section 4(C) of this Note to the contrary, prior to the First P&I Payment Due Date the Note Holder will not include in the monthly payment any amount to repay the unpaid principal. Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

Beginning with the First P&I Payment Due Date, my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Sections 4 and 5 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of   February, 2012   , and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding   two and 750/1000ths   percentage point(s) (   2.750   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than   11.375   % or less than   2.750   %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than   two and NO/1000ths   percentage point(s) (   2.000   %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than   11.375   %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15          calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000      % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Jose M Garcia                    -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

*[Sign Original Only]*

Loan No: 125442122

Form 5600
6/05

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan #: 125442122

THIS ADDENDUM is made this **2nd** day of **February, 2007** , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

1.    Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first **one** ( **1** ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first **one** ( **1** ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.    All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated: ___02/02/07_____

_____ (Seal)
Jose M Garcia              -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - ARM
First Mortgages - Multistate, Arkansas (loans over $150,000)

8480279 (0407)          VMP Mortgage Solutions, Inc. (800)521-7291          SPD #084
(08/04)

# ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: 125442122

THIS ADDENDUM is made this **2nd** day of **February, 2007**, and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than **11.375** % or less than **2.750** %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than **two and NO/1000ths** percentage point(s) ( **2.000** %) from the rate of interest I have been paying for the preceding **12** months. My interest rate will never be greater than **11.375** % or less than **2.750** %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated: 02/02/07

_____ (Seal)
Jose M Garcia                    -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

**IndyMac Bank**
**ARM Note Addendum - Multistate**
**8480344** (0602)

VMP Mortgage Solutions, Inc.



1074
(2/06)

After recording please return to:
IndyMac Bank, F.S.B. c/o Document
Management

*[Company Name]*

*[Name of Natural Person]*
901 E. 104th Street Building B Suite
400/500
*[Street Address]*
Kansas City, MO 64131

*[City, State Zip Code]*

**This instrument was prepared by:**
Rahila Hyder

*[Name of Natural Person]*
20 N. Martingale Road

*[Street Address]*
Schaumburg, IL 60173

*[City, State Zip Code]*

————————————————————[Space Above This Line For Recording Data]————————————————————

# MORTGAGE

**MIN: 100055401254421227**

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated    February 2, 2007    , together with all Riders to this document.

**(B)**    **"Borrower"** is  Jose M Garcia and Irma Garcia , HUSBAND AND WIFE INT'. [signature] . Borrower is the trustor under this Security Instrument.

**(C)**    **"MERS"** is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  **MERS is the mortgagee under this Security Instrument.**  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

Loan No: 125442122



(D)    "Lender" is  IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a            Federal Savings Bank            organized and existing under the laws of
United States of America    . Lender's address is  155 North Lake Avenue, Pasadena,
CA 91101

(E)    "Note" means the promissory note signed by Borrower and dated    February 2, 2007    . The
Note states that Borrower owes Lender  three hundred sixty thousand and NO/100ths
                                                                                        Dollars
(U.S. $  360,000.00    ) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments
and to pay the debt in full not later than    February 1, 2037    .

(F)    "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G)    "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☒ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☐ Other(s) [specify] | | |

(I)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances
and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable
judicial opinions.

(J)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association or
similar organization.

(K)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer,
or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term
includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by
telephone, wire transfers, and automated clearinghouse transfers.

(L)    "Escrow Items" means those items that are described in Section 3.

(M)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to,
or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance
in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

Loan No: 125442122

# TRUTH IN LENDING DISCLOSURE STATEMENT

**DATE:** February 2, 2007     **LOAN #:** 125442122

**CREDITOR:** IndyMac Bank, F.S.B.

**NAME OF BORROWER(S):** Jose M Garcia

**MAILING ADDRESS:**    5425 W Carmen Avenue, Chicago, IL 60630

**PROPERTY ADDRESS:**    5425 W Carmen Avenue, Chicago, IL 60630

| ANNUAL PERCENTAGE RATE The cost of your credit at a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | AMOUNT FINANCED The amount of credit provided to you or on your behalf | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 7.620% | $   637,377.26 | $   353,043.00 | $   990,420.26 |

Your payment schedule will be:   **monthly, as follows**

**Construction Loan:**  ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning , you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled below.

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 60 | 1,912.50 | 03/01/2007 | | | | | | |
| 60 | 2,437.50 | 03/01/2012 | | | | | | |
| 239 | 3,039.25 | 03/01/2017 | | | | | | |
| 1 | 3,039.51 | 02/01/2037 | | | | | | |

**Demand Feature:**  ☒ This loan does not have a Demand Feature.  ☐ This loan has a Demand Feature.

**Variable Rate:**  ☒ If checked, this loan contains a variable rate feature. Disclosures about the variable rate feature were provided to you earlier.

**Assumption:**  Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:**  You are giving a security interest in the property located at:    5425 W Carmen Avenue, Chicago, IL 60630
You are giving a security interest in:   **The Property Being Purchased.**

**Late Charge:**  If a payment is not received by the end of   **15**   days after the date it is due, you will be charged   **5.00**   % of the overdue payment.

**Prepayment:**  If you pay this loan early you ☒ may ☐ will not have to pay a penalty. If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:**  ☐ If checked, the annual percentage rate does not take into account your required deposit.

**Property Insurance:**  Property insurance is required on this loan. Flood insurance may be required if the property is located in a area designated as an area having special flood hazards. You may obtain property insurance and, if required, flood insurance from anyone you want that is acceptable to Creditor.

**Filing Fee:**  $   200.00   (e)
"e" means estimate

See your contract documents for any additional information about non-payment, default, any required payment in full before the scheduled date, and any prepayment refunds.

☐ all dates and numerical disclosures except the late payments disclosures are estimates

February  2, 2007    10:26:33       Index = 5.4100    Margin= 2.750

The undersigned hereby acknowledge receipt of a completed copy of this Disclosure, and if this loan has a Variable Rate feature, a copy of an Adjustable/Variable Rate Loan Program Disclosure along with a copy of The Consumer Handbook on Adjustable Rate Mortgages (CHARM Booklet). The undersigned understand that this is not a contract or a loan commitment.

| | | |
|---|---|---|
| Jose M Garcia | (Borrower) (Date) | Irma Garcia | (Borrower) (Date) |
| | (Borrower) (Date) | | (Borrower) (Date) |

**NOTE:  Payments shown above do not include reserve deposits for taxes, property or flood insurance.**

Loan No:  125442122

Truth in Lending Disclosure Statement (Multistate)
IndyMac Bank, F.S.B.                    Page 2 of 2                    82001MU 01/07

Loan Number:  125442122                                     Date: February 2, 2007

# SIGNATURE AFFIDAVIT AND AKA STATEMENT

I certify that this is my true and correct signature.  This signature must match the signature on the Note and Security Instrument.

Irma Garcia
_____
                         Borrower          Sample Signature        Irma Garcia

I further certify that I am also known as:
 Irma Garcia

Please sign each variation below.

Variation 1:  Irma Garcia                          Variation 2:
_____          _____

Variation 3:                                       Variation 4:
_____          _____

Variation 5:                                       Variation 6:
_____          _____

Variation 7:                                       Variation 8:
_____          _____

Other Variation:                                   Other Variation:
_____          _____

State/Commonwealth of  IL
County/Parish of  COOK

Subscribed and sworn (affirmed) before me
this  2nd  day of  FEBRUARY 2007

"OFFICIAL SEAL"
MICHAEL ANTHONY LEE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4/19/2010

Notary Public in and for
the State/Commonwealth of
County/Parish of  COOK
My Commission Expires:  04/19/10

# ANSWERS TO
# THE MOST FREQUENTLY ASKED
# TRUTH IN LENDING QUESTIONS

Loan No: 125442122

**1.    What is a Truth In Lending Disclosure and why do I receive it?**
Your creditor is required by federal law to provide the information on this disclosure. The disclosure is designed to give you information about the costs of your loan so that you may compare these costs with those of other loan programs or lenders.

**2.    What is the Annual Percentage Rate (APR) and why is it different from the initial interest rate on my loan?**
The APR is the cost of your credit expressed as an annual rate, and can be compared to the APR on other loan programs to give you a consistent means of comparing rates and programs. The APR is computed from the Amount Financed and is based on what your proposed payments will be on the actual loan amount credited to you at settlement. In a $50,000 loan with $2,000 Prepaid Finance Charges, a 30 year term, and a fixed interest rate of 12%, the payments would be $514.31 (principal and interest). Since the APR is based on the Amount Financed ($48,000), while the payment is based on the actual loan amount given ($50,000), the APR (12.533%) is higher than the 12% interest rate.

**3.    What is the Finance Charge?**
The Finance Charge is the cost of credit expressed in dollars. It is the total amount of interest calculated at the interest rate over the life of the loan, plus Prepaid Finance Charges and the total amount of any required mortgage insurance charged over the life of the loan.

**4.    What is the Amount Financed?**
The Amount Financed is the loan amount applied for, minus the Prepaid Finance Charges. Prepaid Finance Charges include items paid at or before settlement, such as loan origination, commitment or discount fees ("points"), adjusted interest, and initial mortgage insurance premium. The Amount Financed is lower than the amount you applied for because it represents a NET figure. If you applied for $50,000 and the Prepaid Finance Charges total $2,000, the Amount Financed would be $48,000. However, if your loan is approved in the amount requested, you will receive credit for the full amount for which you applied. In this example, you would receive a $50,000, not a $48,000, loan.

**5.    What is the Total of Payments?**
This figure represents the total amount you will have paid if you make the minimum required payments for the entire term of the loan. This includes principal, interest and mortgage insurance premiums, but does not include payments for real estate taxes or property insurance premiums.

**6.    What if my Disclosure states that I will not be entitled to a refund of part of the finance charge? What does this mean?**
This means that you will be charged interest for the period of time in which you used the money loaned to you. Your prepaid finance charges are generally not refundable, nor is any interest which has already been paid.



**(O)**    **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**3TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the    County    of    Cook    :
    *[Type of Recording Jurisdiction]*    *[Name of Recording Jurisdiction]*
THE EAST 25 FEET OF LOT 24 BLOCK 16 IN THE VILLAGE OF JEFFERSON, IN THE WEST ½ OF THE SOUTHWEST ¼ OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Parcel Identification No:    13-09-311-049-0000

which currently has the address of 5425 W Carmen Avenue
                                    *[Street]*
Chicago                   ,          Illinois    60630                     ("Property Address"):
              *[City]*                          *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Loan No: 125442122

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's



obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be

Loan No: 125442122

maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in

Loan No: 125442122

writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

    **7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

    Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    **8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    **9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

    Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    **10.  Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately

designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount



of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any



other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of:

Loan No: 125442122

(a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

    **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

    Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

    **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally

recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22.  Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify:  (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23.  Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24.  Waiver of Homestead.**  In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25.  Placement of Collateral Protection Insurance.**  Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower s agreement with Lender, Lender may purchase insurance at Borrower s expense to protect Lender s interests in Borrower s collateral.  This insurance may, but need not, protect Borrower s interests.  The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral.  Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower s and Lender s agreement.  If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower s total outstanding balance or obligation.  The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                      Jose M Garcia                      -Borrower
                                                                         *[Printed Name]*

Printed Name: _____ *[Please Complete]*

_____    _____ (Seal)
                                      Irma Garcia                        -Borrower
                                                                         *[Printed Name]*

Printed Name: _____ *[Please Complete]*

                                      _____ (Seal)
                                                                         -Borrower
                                                                         *[Printed Name]*


                                      _____ (Seal)
                                                                         -Borrower
                                                                         *[Printed Name]*


State of ___IL___                          §
                                           §
County of ___Cook___                       §

Before me the undersigned authority, on this day personally appeared  Jose M Garcia and Irma Garcia

, known to me (or proved to me through an identity card or other document) to be the person(s) whose name is subscribed to the foregoing instrument, and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal on this 2ND day of FEBRUARY 2007 .

(Seal)    "OFFICIAL SEAL"
          MICHAEL ANTHONY LEE
          NOTARY PUBLIC, STATE OF ILLINOIS        _____
          MY COMMISSION EXPIRES 4/19/2010         Notary Public
                                                  My Commission Expires: 4/19/10

Loan No: 125442122

# 1-4 FAMILY RIDER
# (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this  2nd  day of  February,  2007  , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to  IndyMac Bank, F.S.B., a federally chartered savings bank

(the  "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

5425 W Carmen Avenue, Chicago, IL 60630

*[Property Address]*

**1-4 FAMILY COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.**  In addition to the Property described in Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B.  USE OF PROPERTY; COMPLIANCE WITH LAW.**  Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C.  SUBORDINATE LIENS.**  Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D.  RENT LOSS INSURANCE.**  Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.**  Section 19 is deleted.

Loan No: 125442122                                    MIN: 100055401254421227

Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3170 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 1 of 3                    14503MU 08/00 Rev. 11/04
www.compliancesource.com                                        ©2004, The Compliance Source, Inc.



**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.



**I.  CROSS-DEFAULT PROVISION.**  Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
Jose M Garcia               -Borrower          Irma Garcia                 -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                      -Borrower

*[Sign Original Only]*

Loan No: 125442122
Multistate 1-4 Family Rider—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3170 01/01
—THE COMPLIANCE SOURCE, INC.—                        Page 3 of 3                        14503MU 08/00 Rev. 11/04
www.compliancesource.com                                                          ©2004, The Compliance Source, Inc.






*Dorothy Brown*

# Clerk *of the*
## Circuit Court
*Cook County*

Case Information Summary for Case Number
**2008-CH-00568**

Filing Date: 1/7/2008                  Case Type: GENERAL CHANCERY
Division: Chancery Division            District: First Municipal
Ad Damnum: $0.00                       Calendar: 16

### Party Information

**Plaintiff(s)**                       **Attorney(s)**

GARCIA JOSE M                          LARSON KEIL
                                       MARQUIS

                                       800 N CLARK # 222

                                       CHICAGO IL, 60610

                                       (312) 664-9300

GARCIA IRMA

**Date of
Service**          **Defendant(s)**          **Attorney(s)**

                   ELROD MARIA

                   INDYMAC BANK

                   MIDWEST MUTUAL
                   MORTGAGE

### Case Activity

Activity Date: 1/7/2008                        Participant: GARCIA JOSE M

GENERAL CHANCERY FILED

Court Fee: 294.00                    Attorney: LARSON KEIL MARQUIS

Activity Date: 1/7/2008                              Participant: GARCIA JOSE M

## CASE SET ON CASE MANAGEMENT CALL

Court Date: 6/4/2008                    Judge: AGRAN, MARTIN S.
Court Time: 1030                    Attorney: LARSON KEIL MARQUIS
Court Room: 2102

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the Circuit Court of Cook County warrants the accuracy, completeness, or the currency of this data. This data is not an official record of the Court or the Clerk and may not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data in our master database.

Return to Search Page